Mr. Chief Justice, and may it please the Court, the Court of Appeals erred in holding that Congress's decision not to extend its Supplemental Security Income Program to Puerto Rico lacks a rational basis. As this Court has recognized, Puerto Rico has a unique tax status vis-a-vis the federal government. Puerto Rico's residents and employers contribute to federal unemployment insurance and to the Social Security and Medicare trust funds, and they receive benefits from those programs. But Congress has expressly exempted them from the obligations to pay many forms of federal taxes, including federal income tax in most instances, excise taxes, gift taxes, and estate taxes, which means that much of the revenue that would have flowed into the federal treasury can instead be tapped by territorial government, which therefore has greater leeway to make different fiscal or economic choices consistent with its distinctive status as a self-governing commonwealth. Congress could reasonably take those considerations into account when deciding that Puerto Rico's residents would receive some federal benefits but not others, and this Court has already recognized as much when it concluded in Torres and Rosario that there is a rational basis for Congress to exclude Puerto Rico's residents from participation in a social welfare program. Of course, it would also be rational for Congress to make changes on either side of its balance between taxes and benefits, and the President has already called on Congress to extend SSI benefits to the residents of Puerto Rico. But whether and how to alter the balances underlying current social welfare policies are decisions that are left to Congress and evaluated under a deferential rational basis standard that this Court should find has been satisfied here. I welcome the Court's questions. Mr. Gannon, do you think that the Territory Clause is enough of a source of authority for the government or Congress to have a rational basis to do what it's doing? We aren't resting just on the Territory Clause here, Justice Thomas. We agree that the Equal in the Fifth Amendment's Due Process Clause applies here, and there does need to be a rational basis. The fact that the Territory Clause gives Congress a different and unique source of authorities over territories does mean that it is inescapably the case that Congress often legislates differently with respect to a territory than it does with respect to the rest of the country. Well, how much of your argument depends on that? I'm trying to sort of figure out whether or not just merely under the Territory Clause, how much could you do? For example, I give you a different approach. Could you do the same thing to Vermont? The question would still be governed by a rational basis. Well, I guess, how different would the test be for Vermont versus Puerto Rico? I don't think the rational basis test would be different. I think the Court would still be looking under that deferential screen into whether there is a legitimate governmental interest that's being served by drawing a different line there. And there are federal laws that make state-by-state distinctions, but I do think that the Territory Clause means that it is natural that Congress has often legislated differently with respect to territories, and therefore, it is going to be a more common breakpoint in legislation. But here, we think that the reason is deeper because it relates to the balance of federal benefits and burdens that apply in the Territory differently than they do in the states. And so, if Vermont had a different relationship with the federal government on the one side, then it might be easier for the federal government to alter it on the other side. And in this instance, it doesn't. Now, Congress always takes into account, it is always legitimate for Congress to take into account the source of federal funding associated with a particular program. Sometimes that connection is obvious. In the case of the Medicare and Social Security trust funds, that's something where there's a one-to-one relationship for refundable tax credits. It's usually somebody needs to be filing a federal income tax return in order to be eligible for a refundable tax credit, and the connection is sometimes more obvious like that. But in this instance, we think that it is clear, as the Court recognized in Torres and Rosario, that Congress, its relationship with the Territory is different largely in this context of a social welfare benefit program because of the different burdens that the tax, the federal tax structure opposes in Puerto Rico. And that means that there is a smaller tax bite being taken out of the Puerto Rico community by the federal government, which leaves Puerto Rico greater leeway than Vermont would have to deal with this problem in its own fashion. Do the insular cases have anything to do with this litigation? We don't think that they affect the analysis that the Court needs to apply here because we acknowledge that the equal protection component of the Fifth Amendment is applicable here. The insular cases were about whether there are different portions of the Constitution that apply differently to different territories. And here, everybody has acknowledged, this Court has previously held, that the equal protection component of the Fifth Amendment applies to Puerto Rico. And therefore, we don't think that the Court needs to address the insular cases here any more than it did last year in Aurelius, where it noted that the Court has repeatedly declined to extend the insular cases. It declared that in Read Against Covert in the 1950s. Counselor, if that's true, why shouldn't we just admit that the insular cases were incorrectly decided? Well, I think that that would not be the Court's normal course to just say that several cases are incorrect. I'm asking for the government's position. I'm not asking for thoughts about the Court's normal course. From the government's point of view, if the insular cases are wrong, and if you're proceeding on a premise inconsistent with them, why shouldn't we just say what everyone knows to be true? Well, I don't think we're proceeding on a premise that's inconsistent with the insular cases, because... I think you've said that you're proceeding on a premise that the Constitution applies fully, without exception, in respect to this claim, right? With respect to the Equal Protection Claim, yes. I don't think that that's the only thing that the insular cases decided. What is the government's position on the insular cases? The government's position on the insular cases is that some of the reasoning and rhetoric there is obviously anathema, has been for decades, if not from the outset, but that they are not at issue in this case, because the conclusion that parts of the Constitution wouldn't apply to Puerto Rico doesn't decide anything that is relevant to this case. The equal protection component applies here, and therefore, just as in Aurelius, the Court doesn't need to say anything else about the insular cases in order to decide this case. Counselor, can I unpackage your arguments? Let's start with Justice Thomas's question. If Congress said, Vermont, you have too many needy people, the cost is going to be too great to us, we're not going to pass this law on to Vermont, would that pass equal protection? I think it might. Under what theory? Under the theory of, if there is, I mean, it wouldn't be the theory that we're using here, which is that there is a different relationship between... Well, but I'm trying to figure out the different relationship for this reason. It seems to be that what you're saying, and correct me if I'm wrong, cost alone is not enough. Cost plus something else is. Correct? That's correct. All right, so let's look at the plus of that. This program is fully funded by the federal government, fully administered by the federal government. There's no cost to Puerto Rico. There's no cost to any state. And so I don't understand what the different relationship with Puerto Rico has to do with this program, because there's no cost to the government. It's not as if it could take this federal money, Puerto Rico, and distribute it in some other way, or put this money to use in some other way, because the money's going directly to the people, not to the government. So I don't see how that can be a plus with respect to the self-governments of Puerto Rico. That's true, Justice Sotomayor, with respect to the money that's coming back from the federal government to the recipients of the program. Well, it's not coming back. Well, let's go back to that point, okay? As the courts below noted, no, most of the SSI recipients, if not all of them, don't pay taxes. And the state doesn't. So it's not as if the recipients of this money are any different among themselves. Puerto Ricans are citizens, and the Constitution applies to them. Their needy people are being treated different than the needy people in the 50 states, the District of Columbia, and the Northern Mariana Islands. So explain how those people, none of whom pay taxes to the federal government, how are they different? They are different. First of all, there may be some taxes from which they are exempt, like the excise taxes, as we do point out. But the reason, the primary reason why they are different is because they live in a community and a locality where there is less tax money being taken by the federal government out of that community to be being taken into the general revenues at the federal level, which is then distributed through various federal benefit programs and other things. So what do I do with the record that I see in the First Circuit case, Pena, that shows that Puerto Ricans pay, maybe not excise tax, maybe not income tax, but that they pay as combined taxes as other states in the union, meaning it's nice to sort of cherry-pick one tax. But that's true around the country. The government gives some tax benefits to some things and not others. You've got to look at the structure as a whole to see is there really substantial difference. But I'm looking at that record and it shows Puerto Ricans as a community and all the other taxes they pay, pay more than many states of the union. So I don't know how exempting out one or two taxes gets you away from seeing whether the government's distinction is rational based on the need of the citizens who are supposed to receive the money. And the tax bite that the federal government is taking from the entire community is lower. And so on a per capita basis... It's not. I mean, the Pena case showed it exceeds some other states. The aggregate amount of money that is being sent to Washington is greater than in some states, but there's a larger community in Puerto Rico that's being taxed. And they are, of course, getting benefits under many federal programs. So our point here is not... So are the states under many other programs. So you can't compare apples and oranges. I'm sorry, Justice Ginsburg. No, I wonder is that a reasonable, rational, or arbitrary thing to do for Congress to say, you know what, we discovered a state over here, maybe it's Mississippi, or maybe it's California, proportionate to the number of SSI things, it's greater than 14 other states. So we cut them out of the program. How long do you think that would last? Well, I don't know how long that would last. But I mean, what's your rationale? Why is that a rational thing? The rationale is that this is, it is always appropriate for Congress to take account of the general balance of benefits and burdens associated with a particular federal program. And here, this program is funded out of general federal revenues. And when the locality at issue pays in less into that income stream than others do, that means that there is more money left in the community. Has it ever happened? Pardon? Has it ever happened? It's whichever happened. Well, that's what we're talking about. They cut out a state because the proportion amount is greater. They have not done that with respect to this program, no. Let me add one thing. The thing I would add is there's not a word about Puerto Rico in this statute. It has a definition of the United States. It doesn't say anything about Puerto Rico. But there is a relevant sentence in the Federal Relations Act, I think, but you can tell me I'm wrong. It said federal laws, not locally inapplicable, shall apply to Puerto Rico. Okay. Why is this law locally inapplicable? Even if your theory is right, it's never happened in the case of a state. And there is good reason for applying it. There are a lot of SSI people in Puerto Rico, and there is no real connection between the SSI beneficiaries and federal taxes, and they pay a lot of taxes. So what's your best argument? No, this is locally inapplicable. Why? It's locally inapplicable because the statutory definition makes it inapplicable. It defines the program as being available in the United States. Congress then, as it routinely does with respect to different programs, has specified what that means in this particular context. And I don't think that you should draw any particular inference from the fact that the language that they use there has to do with the United States. Sometimes when Puerto Rico is included in a program, it's defined as being a state, and sometimes it's defined as not. What I'm actually thinking is, I'm not thinking something that simple, and I haven't got it quite worked out, but those words locally inapplicable and the Federal Relations Act were designed to put Puerto Rico in a status that isn't, in practice, quite that of a territory. Although it's not a state, it's a commonwealth. It's the Estado Libre Asociado, and no one knows exactly what that is. And so shouldn't we, in fact, look at the purpose of the Federal Relations Act and say it takes a little bit more, a little bit more in terms of a good reason to exclude Puerto Rico from a benefit than it would the Marianas and Guam and the other territories that have no such act? Or is it totally irrelevant? Did we tell the United Nations something that wasn't true? We did not tell the United Nations something that wasn't true, and we've said that we think that one of the reasons why this is justified is because it does indeed help promote territorial autonomy because it is related to the fact that as Congress is taking fewer federal tax dollars from the Puerto Rico economy, it leaves greater leeway for the territorial government to have its own tax structure. The government, is this the same government that is bankrupt and that is being run, the economy, by people, some of them anyway, not from Puerto Rico, but from under a law that applies from the mainland to the mainland? And is this the same program that would, in the United States, give people on average, who need it, $418 a month, as opposed to what Puerto Rico can afford to give them, which is $58 a month? It is the same program. We think that the PROMESA statute, which was enacted about two months before the benefits that are actually at issue in this case, but we don't think that that affects the analysis here. PROMESA itself is a temporary bankruptcy measure that is intended to assist in restoring Puerto Rico's fiscal economy and its security. It is itself intended to promote autonomy by restoring Puerto Rico's fiscal footing. And therefore, as here, Congress is seeking to make locally applicable laws. It has made the determination, the federal relationship principle here is something that's been overridden by Congress's specific determination with respect to the applicability of this program. Nobody has ever thought that Puerto Rico might have been implicitly included by virtue of the statute that you cite, Justice Breyer, and that's why this court decided in the 1970s that this particular exclusion was constitutional in Torres. And so, in this context, we think that Puerto Rico does have extra autonomy to deal with this problem precisely because the federal government has taken fewer tax dollars out of that local economy. How much has the federal government, maybe there aren't statistics on this, provided assistance and revenue to Puerto Rico? Do you have any information on that? I don't have aggregate information about how much federal revenues have gone to Puerto Rico, especially in recent years. There are some figures in the SEIU amicus brief that parse data from 2004 and 2010 about the net federal expenditures in different jurisdictions, and I think what they show is that Puerto Rico is not being treated as an extreme outlier. They show that if you take into account federal expenditures in a jurisdiction, subtract out federal taxes that were collected from that jurisdiction, so that's the net expenditures in the jurisdiction, on a per capita basis, Puerto Rico is receiving less back from the federal government than the district in 17 states, but it's receiving more than 33 other states. And so, it's not being treated here as an extreme outlier, but we think it is always appropriate for Congress to take into account this balance of payments consideration, especially against the backdrop of the fact that Puerto Rico as a territory does have its own government. It does have greater wherewithal to... It's hard to imagine that Puerto Rico has the ability, given that it's in temporary bankruptcy, to do what you say, to be able to raise taxes to help the needy. But what do I do with the fact that the findings when Puerto Rico was given federal tax exemption were based on the fact that Congress recognized that the commonwealth economy could not sustain further taxation. So Congress itself, when it exempted federal income tax, made a finding that there isn't the ability to do what you say. It's illusory to think that Puerto Rico's local economy could match the federal economy and give those tax resources to its needy. That was the reason why there shouldn't be two separate tax bites out of the Puerto Rican economy. And so, that's why Congress... No, it said that it couldn't sustain further taxation. It couldn't sustain the additional layer of federal taxation and therefore have the same reduced capacity to issue income taxes that states would have because they have to add on top of what the federal taxes would otherwise be. And this is why the income taxes in Puerto Rico that the territorial government raises are generally at higher rates than states were able to raise because they don't have to take after the federal government has already taken out of that population. Of course, that's not true with respect to FICA. There's still some federal taxes that are being taken out, but they're getting full benefits back. And so here, we think in the aggregate, it's appropriate for Congress to take account of the fact that when there is less total share going into the federal treasury, that there is less of a total share coming back to the community. Mr. Gannon, am I right that that theory would enable Congress to exclude Puerto Rico from any benefits program? Well, I do think that there are other benefits programs that we have not sought to distinguish from this one. There's a case pending in the First Circuit that involves not just SSI, but also SNAP and also the low-income subsidy under Medicare Part D. We have not sought to distinguish those particular benefit programs. I mean, I'm wondering, in your theory, how any such distinction could be made. It seems as though it's a theory that would apply equally well to any benefits program, so that if you are correct, the lesson going forward, and maybe Congress does this and maybe it doesn't, and you might say it's up to them, but the lesson going forward is Congress can do this whenever it wants. We think that here, the rational basis standards that the Court articulated in Torres and applied in Rosario would allow Congress to take into account this consideration, that there is less tax revenue coming in. There's also the cost of the program. That's the other side of the coin. And we think here it is also promoting local autonomy because this is the type of program that, setting aside the straightened attitude of the current economy there, it is still true as a general matter that there is more autonomy in Puerto Rico to have more tax money available for designing different social benefit programs in a different way than the federal government would otherwise necessarily impose or allow in that context. That answer that you're giving, Justice Kagan, it's similar to the one that you keep saying about Congress taking into account revenues coming in and then benefits going out. And I guess I was surprised when Justice Thomas asked you about how much the territories clause bore on this. You seemed to kind of back away a little bit from what you said in your brief, and I understand you're not resting entirely on the territories clause, but your answers seem to take account of the status of Puerto Rico as a territory. Because otherwise, I don't see why your argument doesn't lead exactly to what Justice Breyer said, which is, well, we're looking at it here, and Mississippi is a poorer state, and so the revenues going into the federal treasury are really low compared to the others, and we'd be paying a lot out. I mean, I guess I had understood in your brief to say Mississippi would be distinguishable from Puerto Rico based on statehood. I just want to know what your position is. Am I misunderstanding your argument? Well, I mean, I think there are two ways in which Mississippi is distinguishable. One is that they don't have the differential treatment on the tax side. But secondly, it is the case that the territory clause matters because it means that it is routine for Congress to draw some distinctions with respect to the territories, and the Constitution itself recognizes this as a legitimate dividing line. But if we look back at other equal protection cases, we do think that the Court has acknowledged that Congress can distinguish even among the states. A case like Hodel, the Surface Mining Act case, had differential effect in different states on the basis of geographic criteria that were defined there, and the Court said that that was just subject to rational basis review. How does the fact that Puerto Rico residents are a politically powerless minority, you're just telling us that, can't protect itself the way Mississippi can, and has been subject to, by your own admission right now, a history of discrimination. The Insular cases are a history of discrimination. How does this factor into your argument on rational basis? We don't think that there is any heightened scrutiny here. First, the benefit that's at issue here is not something to which there's a fundamental right. The Court made that clear in Schweiker, which was an SSI case. It made it clear that the only question there is whether there was a suspect class. No, but equal protection is. Yes. The Puerto Ricans are U.S. citizens. They are U.S. citizens, but there is no evidence here linking this exclusion to ethnicity or a history of discrimination. How do you separate it out? Puerto Ricans are Puerto Ricans. They're Hispanic, and they are routinely denied a political voice. They're powerless politically. All you have to do is listen to some of the rhetoric about Puerto Rico, and you know there has been discrimination shown. Why shouldn't that add to the scrutiny? This statute classifies on the basis of location, not ethnicity or race. That's why Respondent was able to get these benefits while he was living in New York. He's not able to get them while he's living in Puerto Rico. There's no evidence that anyone on the other side has cited that ties this determination in the 1970s about how Puerto Rico would be treated in this benefits program to any of the troubling statements in the insular cases from the early 20th century that came from this court. If you thought that that history prevented Congress from drawing any distinctions with respect to the territories, that would be a sea change in equal protection law. Thank you, Counsel. Justice Thomas? Justice Alito? Justice O'Neill? Just to finish that thought, no. But a distinction based on citizenship, period. Needy is needy, whether in Puerto Rico or in the mainland. None of the people who receive it on the mainland pay taxes. None of the money is or would go to Puerto Rico for its self-governance. I do think that restrictions have to be rational, and I'm just not quite sure why that would be. Why one would say that it's rational to treat a group of people, of citizens, differently from other citizens on the mainland when the need is the same. And we think that's because they're situated in a community where Congress has left more tax revenue there, and that makes a difference, and there is nothing that ties the history of discrimination on the basis of ethnicity to this decision that happened in the 1970s. If that were thought to be a through-line throughout the 20th century, then presumably Congress would not, in 1950, have extended ordinary Social Security to residents of Puerto Rico. Justice Kagan? Mr. Gannon, you've gone this whole argument barely mentioning Torres or Rosario. Is that because you think that they do not have any precedential effect? Not at all. We think that even summary reversals of this court have precedential effect. We think that they are correctly decided. Obviously, we have relied on the holding that rational basis review applies here, and that the differential tax treatment and the cost of the program are a rational basis. That's something that Congress has relied on for decades, not just with respect to continuing this treatment on NSSI. And yet, never once did you say to any of these questions, well, that's been asked and answered already by this court. Well, I think it has implicitly been asked and answered by this court in those two cases. Obviously, to the extent that there are arguments, the PROMESA or other things have changed. We don't think that they change the underlying considerations that make this rational, which is the balance of benefits and burdens and respecting local autonomy that derives from allowing Puerto Rico to have less of a federal tax bite and, therefore, an ability to come up with a different system if it chooses to deal with this particular problem. And one other quick question. I understand that there's legislation in Congress now that would remove this exclusion. Were Congress to pass that, how would it affect this case? I don't think it would move this case. I mean, I'm not sure what form it will ultimately pass in if it were to be retroactively applicable and extend back to benefits that were owed between 2013 and 2016. Maybe there would be an argument for mootness. I think that it doesn't otherwise affect the constitutional analysis here. I think it would indicate that it's not true to say that the residents of Puerto Rico are politically powerless if Congress were to pass a statute like that. But I think that there is still a need for the court to decide whether rational basis is the appropriate standard here and whether these types of considerations would satisfy rational basis, because this isn't the only benefit program that would be covered by the First Circuit's analysis. Thank you. Justice Gorsuch? I'd like to follow up on Torres and Rosario for just a moment. You cited them in your brief as pointing out that distinctions based on territory status are generally subject to rational basis review because that distinction between territories and states is in the Constitution. Okay. Is it always the case in the government's view that rational basis applies to distinctions based on territorial status? What if, for example, hypothetically, a statute discriminating against territories could be shown to be the product of invidious racial discrimination? Wouldn't we subject that to strict scrutiny? I think you would. And I think that what the court said in those cases is that Congress may treat that rational basis applies. And the reason it's applying differently, why it's rational basis, is because there's no fundamental right to this particular social welfare benefit. If there were allegations of racial discrimination or other things that trigger heightened scrutiny, then that would be a reason for the court to take the analysis differently. Even if the statute on its face distinguished between states and territories only? I mean, I think that you would need a pretty strong record to overcome the other reasons that might justify that treatment. But if there were evidence that this were based on racial or ethnic considerations, then the court would obviously view that differently than it does here. And you don't see anything in Rosario or Torres that foreclosed that conclusion, do you? I don't think so. Thank you. Justice Kavanaugh? In addition to the constitutional text that Justice Thomas and Justice Barrett mentioned, there's also the precedent that Justice Kagan mentioned. I just want to follow up on that and nail down how much you're relying on that. Are you saying that we couldn't rule the other way without overruling those cases? I think that's basically true, Justice Kavanaugh. I don't think that there are meaningful differences. Obviously the reasoning was brief. We don't think, we don't agree with the First Circuit's conclusion that the holdings there are inapplicable, either because the second case involved a block grant. Even Justice Marshall's dissent didn't consider that to be a sufficient distinction between AFDC and SSI for purposes of the difference between those two cases. And we also don't think that the argument that the court listed three different reasons in its footnote in Torres that were then repeated in Rosario means that we would need to have evidence about the particular type of economic disruption that would be affected in the local economy in order to rest on those cases. We think that the holding is that rational basis is applicable, and these reasons, especially the benefit of the tax and burdens, the cost and benefits analysis associated with local autonomy is sufficient to say that this satisfies the type of rational basis review that the court applied in those two cases. And then one factual question. The respondent here is still eligible for a waiver from paying the $28,000, correct? Under the regulations, he could seek a waiver. There are different criteria for the waiver. I just want to make sure he's still eligible for the waiver. Yes, I think he would be able to seek the waiver. This case arises in an unusual procedural context, and as was made clear at the district court level, we did not, the SSA did not send him a notice of overpayment, which would have triggered his ability to respond in the administrative context, but the regulations would still allow that. Thank you. Justice Barrett? I just have a factual question. So you said the First Circuit's reasoning would require extending not only SSI benefits to Puerto Ricans, but a variety of other federal benefit programs for which they may not be currently eligible. And I assume that the reasoning would also require the extension of benefits to some other territories who don't currently receive them. I know the Mariana Islands are getting SSI, maybe not TANF, you know, Guam, et cetera. SSI, I gather, is at about a $2 billion expense, roughly, to send it? In Puerto Rico, yes. Do you have a number on what the implications would be of the First Circuit's reasoning if, you know, everything that I just said, extending more benefits to Puerto Rico and to other territories? I don't have a number. The number on SSI for the other territories is cited, and that's actually much smaller. But I don't know what the cost of the other benefits programs are, and the challenges there are sometimes going to follow from complete exclusions, and sometimes they might just follow from significantly differential treatment. And so the SNAP program and the low-income subsidy in Medicare Part D are the two other issues that are at stake in a pending First Circuit case where we have not sought to draw distinctions between SSI and those programs. We have repeated and preserved the arguments that we're making here, but we have not tried to otherwise distinguish them. And we don't understand the other size arguments here to be drawing a line between, for instance, individual benefit programs or block grants that are jointly administered by the federal government and states and territories. Thank you, Mr. Cannon. Thank you, counsel. Mr. Ferre? Mr. Chief Justice, and may it please the Court. Not long ago, Americans with disabilities, especially the poor, were practically excluded from society. The SSI program helped change that, replacing an uneven patchwork of programs with a uniform standard of national support, guaranteeing poor and disabled Americans the autonomy to buy their own food and clothing, move more freely, and live with dignity. But that guarantee is not enjoyed by all Americans. Some are excluded because of where they live in the country. My client, Mr. Valmadero, an American citizen, qualified for SSI after suffering a debilitating illness while living in New York. His benefits were then revoked solely because he moved to Puerto Rico. We're here today because the government has sued him to recover payments he received while living there, even though he remained disabled and unable to work. Congress's decision to exclude the poor and disabled in Puerto Rico is based on the false premise that they are outside the U.S. The Downs Court, the same court that decided Plessy deemed Puerto Rico foreign for domestic purposes because of the race and ancestry of its people. And as was made clear in Califano v. Gautier-Torres, that premise from Downs continues to provide an excuse for Congress to deny equal treatment. As such, the proper basis to examine the exclusion here is heightened scrutiny. But it is also simply irrational to treat Mr. Valmadero differently just because he's now in Puerto Rico. That is what the lower courts unanimously held. For all relevant purposes, he is the same as similarly situated individuals in the states and the northern Mariana Islands. Tax status is irrelevant. Those poor enough to qualify for SSI pay no federal tax, and they don't have to, to qualify. I welcome your questions. Counsel, just to help clarify things for me, we're talking a lot here about Puerto Rico, but in equal protection cases, we normally attach the classification to the individual. So let's assume that I concede that Mr. Valmadero would be classified, let's say, in an ethnic group, and hence you get an heightened scrutiny. But can you transfer the treatment, the concerns that you have about the treatment of Puerto Rico, to a citizen of Puerto Rico, or to a resident of Puerto Rico, for equal protection analysis purposes? Yes, Your Honor. I believe that treating a citizen as though they're foreign because they happen to reside in Puerto Rico is the issue. Okay, so let's assume that someone who is of Italian descent has lived in New York City all of his life, and decides, you know, Puerto Rico's really a nice place. I think I'm going to move to Puerto Rico. And assume after that, that the exact same thing happens to him, has happened to respondent here. But he's Italian. How would you analyze that? Would it be any different? No, the analysis would be the same. So you are transferring the relationship with Puerto Rico to the individual who happens to reside in Puerto Rico? Yes, that's correct, Your Honor. Do you have any cases in which that has been the case? I mean, you have equal protection cases involving women, or blacks, or members of Hispanic groups, et cetera, Native Americans. In other words, characteristics that attach to the individual. Do you have any where we have transferred the treatment of a state to an individual? I think, Your Honor, that this is a circumstance in which, because of the characterization of these unincorporated territories, anyone who now moves to these unincorporated territories is deemed now to be in a foreign country. And so that is the issue here. So I think that that does highlight that even if a non-Puerto Rican moves to Puerto Rico, they are now treated as being outside of their nation. Thank you. Counsel, is there any reason that your argument would not apply to every federal benefit program? In other words, Puerto Rico, whatever reason is offered, is excluded from some federal benefit program. It doesn't matter, does it, that this is SSI? Well, we do think that it matters that this program, which is a federal program administered by the federal government and directed at individuals and has absolutely no component that takes into account local conditions or whether the state can assist or cannot assist. In fact, if states decide that they want to add additional assistance, this program permits them to do that. This program is unique in that it is a federal program directed at individuals without needing a cooperation from this local jurisdiction. When you say unique, does that mean, I mean, I know what unique means, but do you really mean to say that there is no federal benefit program like this one? Well, this one is unique in that it is exclusively federal. There are other programs, for example, the SNAP program that requires a partnership between the federal government and the local jurisdictions. And so those programs might be seen differently because Congress then has the ability with respect to the territories to act on both sides of that partnership. That creates another problem because, of course, when Congress is acting on behalf of the territories, there is no political fallout if it acts contrary to the interest of the people of the territories. Mr. Furey, to go back to some questions that we asked Mr. Gannon about the effect of the territories clause here, it does seem as though that clause, which Mr. Gannon relied on as part of a larger package, but if we just take that piece of it, that that clause goes pretty far towards authorizing Congress to make rules about the territories, which inevitably means or may inevitably mean to make distinctions between the territories and other parts of the United States. So why shouldn't we understand the clause essentially to resolve this matter? Well, we believe the territory clause was intended for Congress to have the power to provide all rules and regulations respecting the territory acting as a state would within the jurisdiction of a state. And we believe that that was intended to be temporary while the territory was in pupillage. The problem here is that the Insular Cases has created a circumstance in which that temporary period has become indefinite. So there is a concern that the territory clause could potentially be abused in the sense that Congress can step in for an indefinite period without actually guiding the territory towards statehood or if it decides that a territory is to be disposed of. So do I understand that argument to be that the territories clause has a sort of implicit expiration date attached to it? Well, I think that the early court decisions certainly viewed the territory clause as being temporary and that the purpose of the territory clause was for Congress to guide those territories towards statehood. And the court changed that view in the Insular Cases for the first time deeming these territories, the territories acquired from Spain, to now be unincorporated and therefore not destined for statehood. That's a big claim. Do we need to accept it to rule for you? No, I don't believe so. But I think that it informs the analysis as to how the people of the territories have been excluded. They've been excluded because they are deemed to be outside the United States. There is a contrast between, for example, how Hawaii and Alaska was treated when those states were territories. We can see that, for example, when the Social Security Act was first passed and provisions that provided for assistance included individuals in Hawaii and Alaska but excluded the people of the unincorporated territories. Mr. Frey, do we need to overrule Torres and Rosario? Well I think that certainly with respect to the applicable standard, I think that Harris seems to make a blanket statement that just the mere fact that the territory clause applies means that any congressional action with respect to Puerto Rico is entitled to a rational basis review. I don't think that follows. So yes, you can't win unless we overrule them, or at least Harris versus Rosario. There is a, yes, I believe that they should be overruled. Certainly this case has received attention that the Gautier-Torres and Harris cases just did not receive, so whatever the outcome. So yes, just yes or no? Yes, yes ma'am. Okay, thank you. That's why I wondered, you heard, you lose if it is true, I think, that Congress could exclude Wyoming, Mississippi, any state where the amount of revenue that comes to the federal government from that state, divided by what they'll have to pay out in SSI. It's smaller than most states, because that's the situation that they say justifies Puerto Rico being treated differently. I don't know about that one. I haven't really thought through that. Second, if you don't lose on that, you lose on Rosario and so forth, unless there's something different about this. All right? At that stage, I thought there are two different things. One is your argument about the Insler cases, and that's a big bite in this case where it isn't fully argued and so forth. But the other ground was the Federal Relations Act, which was designed to create a special status for Puerto Rico. What I have not done is think that through. And so the government correctly says, well, no one's really argued that here. If you think about it, it doesn't create that big a difference from the standard in Rosario. Why should it? And they have a series of arguments. So there we are. Now, why don't you say? Your Honor, so earlier you indicated that the law 600 expressly provides that federal laws are to apply to Puerto Rico, unless not locally applicable. And I think that's correct in that there are no local conditions that would warrant not extending SSI to Puerto Rico. But in addition, local conditions was just not the line that was drawn with respect to the program. So the program is entirely unrelated to local conditions. It's also entirely unrelated to the balance of payments between local jurisdictions and the federal government. So that is just not the line that Congress drew when it put in place the SSI program. Our precedent in the Harris case had to do with a different program than this SSI. So you said to Justice Barrett that we have to overturn that precedent, but why? You said you had two grounds, one that rational basis should not apply. There we might have to overturn it. But even if we kept rational basis, isn't your argument that this is just fundamentally different program? And so you have to view it under rational basis as a different program? Yes, Justice Sotomayor. If we look at the program as a partnership, which is the type of program that was dealt with in Harris, as a partnership between the federal government and the local jurisdictions to be administered by local jurisdictions, well, then it is distinct. It's not the same case that we have here, where this program is entirely run by the federal government and is directed at individuals, not directed at states and territories. So in that case, there's no need to overturn our precedent? That's correct. Thank you. If a person who is a resident of one of the states brought an action claiming that that was violated because he or she was required to pay federal income tax and residents of Puerto Rico are not, what would be the standard of review? Would it be rational basis or would it be something else? I think that under our heightened scrutiny analysis, if the territory is being treated differently, specifically because it's an unincorporated territory and deemed foreign, I would say that that distinction should then be entitled to heightened scrutiny. And it may very well pass a heightened scrutiny analysis because there might be a compelling reason for treating that territory differently. It might be because it is such a poor jurisdiction. It might be that Congress takes into account that the citizens of that jurisdiction are politically powerless. Does it matter for your argument that the geographic scope of the SSI program is defined the way it is? Suppose it were defined this way. Suppose that a person would be eligible for benefits, would be ineligible for benefits if the person resided in a state or other part of the United States that was exempt from the federal income tax. Would that be different? Well, if the program were specified... Right. It says nothing about that it applies only to the states and not to unincorporated territories, any place else within the United States. It simply says that benefits are available only to persons who reside in a state where they are required to pay federal income tax. If that's the line that was drawn in the statute, then it might very well pass a rational basis review. But this program is meant to assist poor individuals who in all likelihood are not the ones that are paying the tax. Counsel can I ask a bigger picture question about the text of the Constitution and our role with respect to the structure? Because I think that's the source of some of the concern here as well as the precedent. You make compelling policy arguments, but there are parts of the Constitution that people would want to change. Two senators per state discriminates against people in larger states. Many in some of those larger states have more minority population. The electoral college gives you a slight, just a slight, but a slight advantage if you're in a smaller state. Delaware and Rhode Island, your vote for president counts a little more than your vote if you live in New York or California, for example. Article 4 is similar. It would take a constitutional amendment to change the first two that I mentioned. Actually, the Constitution purports to prohibit changes to the Senate, but we'll put that aside. But here it leaves it up to Congress. Congress has the ability, the role to make changes over time. It does not give that authority to this court. That's a really big picture concern that I think is reflected then in the precedent about what is our role with respect to the territory clause in terms of structures in the Constitution that may seem anachronistic to some, and the other two I mentioned are things that also seem anachronistic to some. Just your big picture thoughts on that. I think the big picture is that the Constitution promised to citizens a republican form of government. Certainly from the cases, the court's early cases, were that the problem of a non-republican form of government in the territories was a temporary one, which would be resolved as these territories were populated and organized and then became states. That changed with the Insular Cases and has created a system in which populations now are held in an indefinite state of territorial status. So the court essentially blessed the possibility of territories remaining territories in an indefinite state without full participation, without a full seat at the table, if you will. So it's kind of the purpose of the clause, not reflecting the text necessarily, but the purpose of the clause was a time limit of sorts? I would agree with you, Justice Kavanaugh, in that it's also in that section of the Constitution dealing with new states. Right. I agree with that. How do we then figure out that when the time is run? I guess you would say it long since ran in your case. I understand that. Certainly it is up to Congress to make states, but I think that here the court in the Insular Cases essentially stopped the clock so that Congress just did not have to consider the path of these unincorporated territories. Have we ever held that the Republican form of government provision is judicially enforceable? I believe so. I think it's a... What case? I can't. Wasn't there something in Rhode Island? Something happened in Rhode Island, Justice Breyer, and I agree, but I'm not sure what the result of that case was. Look, it's another small state. Right, but it's certainly a basic premise of the Constitution. Well, I don't know that it follows from that, that it's judicially enforceable. We'll check. Would you like us to hold that all federal laws, whether they provide benefits or impose obligations or whether they apply to citizens or to a governmental unit, must apply equally to residents of Puerto Rico and residents of the states across the board, equal treatment in every respect? I think that there is certainly a due process right to equal treatment, equal protection. So if we're looking at how individuals are being treated, yes, and I would say that it would apply. So one way to frame your argument, and tell me if I'm mischaracterizing it in any way, is because of how you think the Territory Clause should be understood and that we should view it as limited, but essentially the question before us is the exact same as if Congress excluded Mississippi from SSI. Is that correct? Yes, Justice Kagan. And then we would go through whatever analysis we would go through with respect to deciding what the proper standard of review was and how it applied, but essentially your claim is that these are two equivalent cases. That's correct. I think that the source of power just shouldn't figure in. I think that here we're looking at the equal protection component of the Due Process Clause. And tell me once more briefly why you think that's true, you know, your best statement as to why the exclusion of Puerto Rico should be treated the same way as the hypothetical exclusion of Mississippi. Because the source of power can't override the rights enshrined in the Constitution. So Congressional power under the Territory Clause can't somehow override these protections in the Constitution. Mr. Frey, can I follow up on Justice Kagan's questions and Justice Alito's questions? So you're maintaining that there should be equal treatment across the board, whether you live in Mississippi or Puerto Rico. And Justice Alito asked you if you maintain that benefits, burdens, et cetera, should be the same. So what are the implications of that position for, you know, policies like Puerto Ricans not paying federal income tax? If we accept your position, would that mean that the burdens that Mississippians bear, et cetera, also have to apply to Puerto Ricans? I think that the analysis would be the same. In other words, the court would look at that exclusion with heightened scrutiny and determine whether there's a compelling interest for treating that jurisdiction differently, in the same way that Congress could decide to treat certain regions of the U.S. differently for tax purposes in order to make sure that you encourage development, for instance. But you see, that's exactly why, Justice Frey's question, that's exactly why what came into my mind are these words, not locally inapplicable, which is different. But I don't know what to do with them. You see, I don't know what to do with them once they're in my head. I mean, it's fairly easy to think of things you might say. You might say Puerto Rico was designed in Law 600 to maintain a kind of independent status, but not totally. No. And therefore, this isn't applicable locally, given that purpose. Or you might say that purpose wasn't the overarching purpose in this instance. So while I often like to look at purposes, I'm at sea in this one. And I don't know how you do this thing comparing Mississippi and Puerto Rico, and when it is and when it isn't. Well, I think Law 600 was intended to give a measure of autonomy to Puerto Rico, akin to the states, without actually extending the full participation available to states. So with respect to local self-rule, if you will, there was that autonomy. Now obviously, Congress has seen fit to take some of that autonomy back, and it did so with the PROMESA Act. So this illustrates that Congress certainly had or believes it continues to have that power to provide, delegate its ability to provide needful rules and regulations respecting Puerto Rico, and it could also take some of that back. I don't know how often Congress enacts a statute that explicitly distinguishes residents of one state from another state, but it certainly does enact laws that have the effect of strongly disfavoring the president's home state of Delaware, where there's no income tax. So what is the difference between that and this? That change in the assault deductions was enacted across the board. So the fact that local conditions then, you know, the result of the uniform application across the board created differences in local conditions doesn't mean that that statute didn't provide the equal treatment. Thank you, Counsel. I feel a little more comfortable now saying that the Guarantee Clause, which guarantees the Republican form of government, we've said it presents a political question, and I wonder if the extent to which you relied on it in one of your prior answers to what extent is it key to your argument. I don't know that it's key to the argument, but I think that the Court should take, and the Court has in the past, certainly taken into account the fact of an individual or a group's political powerlessness. So to the extent that the group that has been targeted is politically powerless, I think, has informed the Court in the past and should do so here. Justice Thomas? So if I move from Virginia to Puerto Rico, how do I, and lose a certain benefit, how could I claim powerlessness? I understand your argument if you have a lifelong resident of Puerto Rico, but you're saying your arguments also apply to anyone who chooses to locate or relocate to Puerto Rico, and that's the part I don't understand, particularly in the case of this argument. When the resident from Virginia decides to move to Puerto Rico, they thereby lose the ability to participate in the federal elections that would result in a representative in Congress, representative in the Senate, and also the ability to vote for president and vice president, all of which then means that that individual has no representative protecting his or her interests while in Puerto Rico. Justice Breyer? Justice O'Meara? Okay. Justice Gorsuch? Just one quick question on the waiver. That's still possible, correct? The government has pursued my client and has never indicated that it is inclined to grant a waiver, but certainly if we were in an administrative proceeding, that is a possibility. The government early on sought to withdraw with prejudice and was not even clear as to whether potential criminal charges were still a possibility. So there was no indication that the government was inclined to consider a waiver. Might you still apply for the waiver if you don't prevail in this case? I would hope so, yes. Justice Breyer? Thank you, counsel. Rebuttal, Mr. Gannon? Thank you, Mr. Chief Justice. If I could just make three points. First, the Territories Clause, the Territory Clause does not have an expiration date, and if it did, the court's analysis in cases like Aurelius would have been completely different. But the fact that we have uncertain future status vis-a-vis the United States is one thing that we think promotes the idea that Congress must necessarily take into account that, among other things, when it is deciding whether to deal differently with territories. So Puerto Rico may be on its way to statehood, it may be on its way to independence, it may be on its way to some other status. But that is relevant to Congress being able to continue to calibrate the degree of relationship between the federal and territorial polities and economies and fiscs. And so that's another reason why being able to promote local autonomy by having a smaller federal tax bite and therefore maybe a smaller share in federal benefits is something that is appropriate for Congress to do in this context. Second, my friend on the other side has still not, I think, given any reason why there's a special justification for overruling Torres and Rosario. We do think that those would be controlling here. Torres was about this particular benefit, and Rosario, I think the fact that it involved a block grant program doesn't meaningfully distinguish it, and it didn't suggest. Since it was drawing from Torres, which was not a block grant program but actually about this program, SSI, an individual benefit program, the court didn't seem to think that that was a reason to draw a distinction. And as I mentioned before, neither did Justice Marshall's dissent. And so finally, my friend has forcefully given reasons why SSI should be extended to residents of Puerto Rico because he thinks that would better promote one of the main purposes of the program. And we don't have a quarrel about that. The only question is whether it could be rational for Congress to have taken into account other considerations and decided in this instance that there was a basis for drawing a different line with respect to Puerto Rico. And unless and until Congress alters Puerto Rico's distinct tax treatment, which Respondent and his amici have pointedly not said that it is required to do, we think there is a plausible, rational, and non-envious basis for Puerto Rico's residents to be excluded from SSI. We urge the Court to reverse the judgment of the Court of Appeals. Thank you, Counsel. Counsel, the case is submitted.